**Quarles & Brady** LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, Arizona 85004-2391
TELEPHONE 602.229.5200

Attorneys for M&I Marshall & Ilsley Bank

Brian Sirower, Esq. (#012354)
brian.sirower@quarles.com

Lori L. Winkelman, Esq. (#021400)
lori.winkelman@quarles.com

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | In Proceedings Under Chapter 7 |
| MICHAEL PYLMAN DAIRY, L.L.C., | Case No. 09-13232-GBN |
| Debtor. | **M&I MARSHALL & ILSLEY BANK'S MOTION TO AUTHORIZE DISTRIBUTION OF CASH PROCEEDS OF COLLATERAL** |

This Motion is filed by M&I MARSHALL & ILSLEY BANK ("M&I"), secured creditor and party-in-interest in the above-captioned Chapter 7 bankruptcy case of MICHAEL PYLMAN DAIRY, L.L.C. (the "Debtor"). By this Motion, M&I requests the Court authorize and order Edward M. Burr, Jr., as Receiver for the M&I Collateral (the "Receiver"), and the United Dairymen of Arizona (the "UDA") to immediately distribute to M&I certain cash proceeds of M&I's collateral, which currently is being held by the Receiver and the UDA, respectively.

In accordance with prior orders of this Court, the Receiver has administered the Debtor's obligations under the CWT Program, engaged in ordinary course sales of livestock, and on July 31, 2009, held an auction sale of virtually all of M&I's remaining collateral.

QB\660471.00212\8578231.2

Accordingly, the Receiver holds sale proceeds from these transactions which should be distributed to M&I. Apart from amounts held by the Receiver, by Court order, the UDA is holding additional proceeds of milk checks that also serve as security for the Debtor's obligations to M&I.

By this Motion, M&I is asking for the Court to authorize the Receiver to distribute cash proceeds of M&I's collateral after costs of sale as more fully described in this Motion and for the Court to authorize a turnover by the UDA of milk check proceeds to the extent such amounts are not in dispute or otherwise subject to adverse claims of other creditors. In light of the fact that M&I has advanced approximately $2.5 million in protective advances to maintain the herd and the dairy operations to support this liquidation, good cause exists for the Court to authorize the release of the cash proceeds without further delay.

This Motion is supported by: (i) the attached Memorandum of Points and Authorities, and (ii) the entire record before this Court in this Chapter 7 case and the Maricopa County Superior Court in the Receivership Action.

RESPECTFULLY SUBMITTED this 25th day of August, 2009.

QUARLES & BRADY LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391


By     /s/ Lori L. Winkelman
    Brian Sirower
    Lori L. Winkelman

Attorneys for M&I Marshall & Ilsley Bank

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL BACKGROUND.

1. On June 15, 2009 (the "Petition Date"), the Debtor filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code, thereby commencing the above-captioned case. In addition, an affiliate of the Debtor, Wigwam Dairy LLC ("Wigwam Dairy"), also filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code, Case No. 09-13241-GBN. The Wigwam Dairy case was not jointly administered with the Debtor's case.

2. On August 10, 2009, the Debtor's case was converted to Chapter 7, and Diane M. Mann was appointed as the Chapter 7 trustee (the "Trustee").

### The Secured Loan from M&I to the Debtor

3. The Debtor is indebted to M&I in an amount in excess of $36,000,000, plus accrued and accruing interest, late charges, attorney's fees, costs, and all other amounts due and owing under the loan documents and applicable law (the "Indebtedness"), as evidenced by a Letter Agreement (as subsequently modified and amended, the "Loan Agreement") dated May 16, 2006, executed by the Debtor and M&I, and a Promissory Note dated May 16, 2006 made by the Debtor in favor of M&I in the original principal amount of $25,000,000.00 (as subsequently modified and amended, the "Revolving Note") and the Promissory Note dated December 30, 2005 in an original principal amount of $8,107,000.00 (the "Tolleson Note") (collectively, the Revolving Note and the Tolleson Note will be referred to herein as the "Notes").

4. As security for the Notes, M&I holds a valid and perfected first priority lien and security interest in substantially all of the Debtor's personal property and business assets (the "Collateral") pursuant to the Agricultural Security Agreement dated December 30, 2005 (the "Security Agreement") executed by the Debtor.[1]

---

[1] M&I also holds a deed of trust lien in real property in Tolleson, Arizona, formerly owned by the Debtor which housed the Debtor's dairy operations (the "Tolleson Property") before the Debtor moved its operations to the Buckeye property.

5. M&I's first priority lien and security interest was properly perfected by filling a UCC financing statement with the Arizona Secretary of State on February 16, 2006 (as amended and modified, the "Financing Statement").

6. The Loan Agreement, the Notes, the Security Agreement, the Financing Statement, and any and all amendments or modifications to any of the foregoing, as well as all other documents evidencing, securing or relating to the loan, including all pledges and milk check assignments, may be referred to collectively hereinafter as the "Loan Documents".

7. The Debtor has defaulted on its obligations under the Loan Documents by, among other things, failing to pay the amounts due upon the maturity of the loan and failing to comply with various loan covenants.

**The Receivership Action**

8. On April 24, 2009, M&I filed its "Verified Complaint And Application For Appointment of Receiver" (the "Complaint") against the Debtor in the Maricopa County Superior Court (the "Superior Court"), thereby initiating Case No. CV2009-012942 (the "Receivership Action").

9. On May 1, 2009, the Superior Court entered the "Order Appointing Receiver" (the "Receivership Order"), and appointed Edward M. Burr, Jr. as the Receiver to administer M&I's Collateral under the Receivership Order. The Debtor stipulated to entry of the Receivership Order.

10. As more specifically described in the Receivership Order, the Receiver was authorized "to marshal, take possession of, control, and administer all of the [Collateral], wherever located, and to protect and preserve the [Collateral]."

11. On July 1, 2009, this Court entered the "Order Granting Emergency Motion To Excuse Turnover Pursuant To Bankruptcy Code § 543(d) And Additionally, Or Alternatively, For Abstention Pursuant To Bankruptcy Code § 305" (the "Initial §543 Order"). In the Initial §543 Order, the Court, among other things, excused the Receiver from compliance with

§§543(a), (b) and (c), and empowered the Receiver to continue managing and preserving the Collateral pursuant to the Receivership Order and specifically to perform the Debtor's obligations under the CWT Program.[2]

12. The Initial §543 Order also ordered that "any and all milk check proceeds held for the benefit of Arizona Grain, Inc. shall be held subject to further order of the Court. This Order shall in no way prejudice the assertion of rights by Arizona Grain, Inc. and M&I in such milk check proceeds. The United Dairymen of Arizona is authorized to continue to hold milk checks not otherwise due to the Debtor or M&I pending further order of the Court." See Initial §543 Order, ¶E.

13. On July 23, 2009, the Court entered a second order—the "Order Granting Emergency Motion To Amend §543 Order To Lift Restrictions On Receiver's Sale Powers" (the "Second §543 Order") (together, the Initial §543 Order and the Second §543 Order may be referred to as the "§543 Orders"). In the Second §543 Order, the Court authorized and empowered the Receiver to continue managing and preserving the Property as set forth in the Receivership Order, including:

> 1. To complete the sales and deliver the bulls sold by the Receiver prior to the filing of the Debtor's Chapter 11 case, including the refund of bidder deposits related thereto.
>
> 2. To conduct the sale of all livestock that was not sold as part of the CWT Program through an auction sale and to hire any and all professionals needed to facilitate this auction sale.
>
> 3. To conduct an auction sale, contemporaneous with the sale of the remaining livestock, of certain personal property claimed as M&I Collateral consisting primarily of feed, farm products, equipment, and intangibles of the Debtor (including,

---

[2] Cooperatives Working Together ("CWT") is a program designed by the Nation's dairy farmers for the purpose of strengthening and stabilizing milk prices by regulating supply. Under the CWT Herd Retirement Program (the "CWT Program"), dairy producers sign and submit a "Dairy Herd Retirement Program Bid Form" (the "CWT Program Bid"), in which a producer offers to sell/retire its entire herd. In exchange, the producer receives payment from the CWT in an amount set forth on the CWT Program Bid. In addition to payment from CWT, the producer also realizes a financial benefit upon the sale and slaughter of its herd, the proceeds of which are retained by the producer. In accordance with the Receivership Order, a CWT Program Bid was submitted by the Receiver and the Debtor on or about May 1, 2009. The bid was ultimately accepted and the milk producing cattle were sold.

without limitation, the milk base owned by the Debtor and Wigwam Dairy), and the Leased Equipment.

See Second §543 Order, at 2-3.

14. Ultimately, an Auction Sale was held on July 31, 2009 and substantially all of the remaining M&I Collateral was liquidated. The Receiver remains in possession of certain items claimed to be the Collateral of M&I which were not sold at the auction and M&I reserves its right to any additional property of the Debtor or third parties to which M&I's liens and security interests extend pursuant to the Loan Documents.

**The CWT Proceeds**

15. The Receiver has now fully performed the Debtor's obligations under the CWT Program and is in the possession of the cash proceeds from that program. See "Receiver's Notice of Results of Auction Conducted on July 31, 2009; Report of CWT Proceeds and Request for Approval and Payment of Auctioneer's Fees" [Docket No. 110] (the "Report"). The CWT Program resulted in two payments, which in the aggregate total $8,498,162.58[3]: (i) proceeds of the prepetition contract under the CWT Program which was based on CWT Program Bid (the "CWT Program Bid Payment") in the amount of $5,216,815.30; and (ii) proceeds from the sale of the milk heard (the "Milk Herd Proceeds") in the amount of $3,281,347.28. After payment of commissions and other costs of sale, the net amount held by the Receiver and which is distributable to M&I is $8,393,080.16 (the "CWT Net Proceeds"). Id.

16. The CWT Net Proceeds are currently held by the Receiver in a segregated account. Id.

17. M&I is not aware of any competing claims to the CWT Net Proceeds, and M&I is entitled to immediate possession of these cash proceeds.

---

[3] All amounts described in this Motion are based on information provided to M&I by the Receiver. M&I expressly reserves its right to supplement and amend this Motion based on any changes in the amounts.

**Auction Sale Proceeds**

18. Pursuant to the Second §543 Order, the Receiver held an auction sale on July 31, 2009 (the "Auction Sale"). The anticipated proceeds from the Auction Sale (the "Auction Sale Proceeds") can be summarized as follows:[4]

| Items Sold | Gross Proceeds | Commission | Net Proceeds |
|---|---|---|---|
| Heifers | $3,512,050.00 | 4% | $3,366,248.40 |
| Holstein Bulls | $89,695.00 | 4% | $85,542.00 |
| Equipment | $309,225.00 | 4% | $296,856.00 |
| Milk Base[5] | $4,746,830.53 | 2% | $4,651,893.92[6] |
| Feed/Hay | $472,300.00 | 4% | $453,408.00 |
| **TOTALS** | **$9,130,100.53** | | **$8,853,948.32**[7] |

19. The Receiver is currently holding the Auction Sale Proceeds received to date in a segregated account. Id. at 4-5. Additional proceeds will be held in the segregated account when received.

20. The Net Auction Sale Proceeds also include proceeds from the sale of the property which was subject to an M&I security interest but which may also be subject to a security interest or other competing claim of the following third parties:

---

[4] Not all the Auction Sale Proceeds have yet been collected by the auctioneer and delivered to the Receiver. For example, certain proceeds from the sale of the milk base have not yet been collected because, in order to transfer the milk base, the successful bidders must file an application for transfer of milk base with the UDA. The sales of milk base are not final until the UDA has approved the transfer to any particular successful bidder. Pending such approval, the successful bidders are required to pay the auctioneer a deposit equal to 25% of the gross proceeds. The balance of the bid amount is due upon the UDA's approval of the successful bidder's transfer application. Through this Motion, M&I requests authorization for the Receiver to distribute such funds to M&I as and when received.

[5] "Milk base" refers to a right that a member of the United Dairymen of Arizona (the "UDA") holds, which represents the amount of milk that the member may sell to the UDA for a set price referred to as the "quota price."

[6] At the Auction Sale, the Receiver sold both the Debtor's milk base as well as Wigwam Dairy's milk base for an aggregate total of $7,289,302.00. According to the Receiver, the allocation of these milk base proceeds to each dairy, after subtracting a 2% commission, is as follows: Michael Pylman Dairy LLC sold 239,551 pounds of milk base for a net total of $4,651,893.92 (the "Pylman Milk Base Proceeds"); Wigwam Dairy LLC sold 128,307 pounds of milk base for a net total of $2,491,622.04 (the "Wigwam Milk Base Proceeds"). Through this Motion, M&I only requests distribution of the undisputed Pylman Milk Base Proceeds. Contemporaneously with this Motion, M&I has filed a Motion to Distribute the Wigwam Milk Base Proceeds in the Wigwam Dairy bankruptcy case.

[7] This amount will be referred to herein as the "Net Auction Sale Proceeds".

Quarles & Brady LLP

- Deere & Company asserts a security interest in certain equipment, indentified as JD 5525 UTTR and JD 8130 RCTR and sold at the Auction Sale. The aggregate proceeds from the sale of these two pieces of equipment total $83,423.44 (the "Deere Equipment Proceeds"). Id. at 5.n.6.

- Rezzonico Ranches, LLC ("Rezzonico") asserts claims secured by identifiable Pylman Milk Base Proceeds in the amount of $408,540.00 (the "Alleged Rezzonico Proceeds"), for which the sale price exceeded the alleged Rezzonico claim.

21. M&I does not, at this time, seek distribution of the Deere Equipment Proceeds or Alleged Rezzonico Proceeds to the extent of their respective claims.[8] Instead, M&I proposes that the Deere Equipment Proceeds and the Alleged Rezzonico Proceeds be held in segregated accounts pending further order of this Court.

22. After accounting for the Deere Equipment Proceeds and the Alleged Rezzonico Proceeds, all remaining Net Auction Sale Proceeds should be distributed to M&I without any further delay with respect to proceeds currently in the possession of the Receiver. As and when the remaining Net Auction Sale Proceeds are collected, the distributable amount of Auction Sale Proceeds to M&I from the Debtor should be $8,361,984.88 (the "Distributable Net Auction Sale Proceeds").

23. M&I is not aware of any competing claims to the Distributable Net Auction Sale Proceeds, and M&I is entitled to immediate possession of these cash proceeds.

**Milk Checks**

24. Pursuant to various agreements, the Debtor sold milk produced from its dairy cattle to the UDA. As such, the UDA currently owes the Debtor certain amounts in

---
[8] M&I reserves all of its rights with respect to these undistributed funds.

1  outstanding "milk checks" (the "Milk Check Proceeds"). Pursuant to the express terms of the Loan Documents, M&I holds a valid and perfected first priority lien and security interest in all the Milk Check Proceeds.

25. Arizona Grain, Inc. ("Arizona Grain") asserts a $332,480.78 interest in the Milk Check Proceeds which is the subject of a pending contested matter before the Court (the "Arizona Grain Holdback").

26. The UDA also may be holding Milk Check Proceeds for the potential benefit of Rezzonico, based on Rezzonico's asserted secured interest in the Debtor's milk base. To the extent Rezzonico is entitled to distribution on account of its asserted interest in the Debtor's milk base, Rezzonico's interests are fully protected by the cash proceeds held by the Receiver from the sale of the Debtor's milk base (sold at the Auction Sale with Rezzonico's consent).

27. In light of the pending dispute regarding the Arizona Grain Holdback, M&I is not requesting distribution of that holdback at this time but reserves all rights to those funds. M&I does ask that all Milk Check Proceeds, other than the Arizona Grain Holdback (the "Distributable Milk Check Proceeds"), be distributed to M&I without delay.

28. M&I is not aware of any competing claims to the Distributable Milk Check Proceeds, and M&I is entitled to immediate possession of these cash proceeds.

**Ordinary Course Sale Proceeds**

29. In addition to the above-referenced amounts, the Receiver is also currently holding $115,175.00 in proceeds from the sale of livestock subject to M&I's security interest in the ordinary course of business, including without limitation the sale of the bulls authorized by the Second §543 Order (the "Ordinary Course Proceeds").

30. M&I is not aware of any competing claims to the Ordinary Course Proceeds, and M&I is entitled to immediate possession of these cash proceeds.

## II. ARGUMENT.

As a secured creditor holding valid and perfected liens and security interests in its Collateral, M&I is entitled to a prompt distribution of the proceeds from the liquidation of the Collateral. In order to protect its interests, M&I obtained the appointment of the Receiver and has funded approximately $2.5 million of expenses to maintain livestock and otherwise protect and preserve its Collateral. Now that the Collateral has largely been liquidated, with M&I bearing the costs related to the care for and liquidation of that Collateral, there is no just reason for any delay in the distribution of cash to M&I on account of its secured claims.

In framing this Motion, M&I has been careful not to ask the Court to authorize the distribution of cash which is the subject of a pending dispute or for which provisions are not made for the protection of other parties. By way of example, by this Motion, M&I is not asking for the distribution of the Arizona Grain Holdback, the Alleged Rezzonico Claim in milk base proceeds, or the Deere Equipment Proceeds. Because of the relevance of the proceedings, M&I will ask for this Motion to be heard contemporaneously with the Court's hearing on the Receiver's auction sale notice.

## III. CONCLUSION.

WHEREFORE, M&I respectfully requests the Court enter an Order:

A. Authorizing and directing the Receiver (or any other entity in possession of the CWT Net Proceeds) to immediately distribute the CWT Net Proceeds to M&I;

B. Authorizing and directing the Receiver (or any other entity in possession of the Distributable Net Auction Sale Proceeds) to immediately distribute the Distributable Net Auction Sale Proceeds to M&I, and remit further collections to M&I as and when received;

C. Authorizing and directing the UDA (or any other entity in possession of the Distributable Milk Check Proceeds) to immediately remit the Distributable Milk Check Proceeds to M&I;

D. Authorizing and directing the Receiver (or any other entity in possession of

the Ordinary Course Proceeds) to immediately distribute the Ordinary Course Proceeds to M&I;

  E. Directing that all other amounts be held in segregated accounts pending further order of this Court; and

  F. Granting such other and further relief as the Court deems just and proper under the facts and circumstances of this case.

  RESPECTFULLY SUBMITTED this 25th day of August, 2009.

QUARLES & BRADY LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391


By /s/ Lori L. Winkelman
  Brian Sirower
  Lori L. Winkelman

Attorneys for M&I Marshall & Ilsley Bank

COPIES of the foregoing sent via
electronic mail this 25th day
of August, 2009, to:

Joseph E. Cotterman, Esq.
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Email: jec@gknet.com
Attorneys for Michael Pylman Dairy, L.L.C.

Wade M. Burgeson, Esq.
ENGELMAN BERGER, P.C.
3636 N. Central Ave., Ste. 700
Phoenix, AZ 85012
Attorneys for Receiver Edward M. Burr, Jr.
Email: wmb@engelmanberger.com

Joseph Wm. Kruchek, Esq.
KUTAK ROCK, LLP
8601 North Scottsdale Road, Suite 300
Scottsdale, Arizona 85253
Email: joseph.kruchek@kutakrock.com
Attorneys for MidFirst Bank

Kevin J. Blakley, Esq.
GAMMAGE & BURNHAM, P.L.C.
Two N. Central Avenue, 18th Floor
Phoenix, Arizona 85004
Email: kblakley@gblaw.com
Attorneys For Imperial Western Products, Inc.

Robert Hall, Esq.
Arizona Attorney General's Office
1275 West Washington Street
Phoenix, Arizona 85007
Email: Robert.Hall@Azag.Gov
Attorneys For Arizona Dept. of Revenue

Brenda Moody Whinery, Esq.
MESCH CLARK & ROTHSCHILD PC
259 North Meyer Avenue
Tucson, Arizona 85701
Email: bwhinery@mcrazlaw.com
Attorneys for Arizona Grain

Carolyn J. Johnsen, Esq.
Todd B. Tuggle, Esq.
JENNINGS, STROUSS & SALMON, PLC
201 East Washington Street, 11th Floor
Phoenix, Arizona 85004-2385
Email: cjjohnsen@jsslaw.com
Email: ttuggle@jsslaw.com
Attorneys for Legacy Farming Company and WSA Farms, LLC

Kelly Singer, Esq.
SQUIRE SANDERS & DEMPSEY
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004
Email: ksinger@ssd.com
Attorneys for The United Dairymen of Arizona

Robert J. Spurlock, Esq.
BONNETT FAIRBOURN FRIEDMAN & BALINT, PC
2901 North Central Avenue, #1000
Phoenix, Arizona 85012
Email: bspurlock@bffb.com
Attorneys for Deere & Company

Jeff Schneidman, Esq.
PLATTNER SCHNEIDMAN & SCHNEIDER PC
4201 N. 24th St., Suite 100
Phoenix, AZ 85016
Email: jschneidman@psslaw.com
Attorneys for Rezzonico Ranches, LLC

Diane M. Mann
29834 North Cave Creek Road
Suite 118-274
Cave Creek, Arizona 85331
Email: dmm1126@aol.com
Chapter 7 Trustee

Adam B. Nach, Esq.
LANE & NACH, P.C.
2025 North Third Street, Suite 157
Phoenix, Arizona 85004
Email: adam.nach@azbar.org
Attorneys for Chapter 7 Trustee

Richard J. Cuellar
OFFICE OF THE U.S. TRUSTEE
230 North First Avenue, #204
Phoenix, Arizona 85003-1706
Email: ric.j.cuellar@usdoj.gov
Attorneys for U.S. Trustee

**COPY** of the foregoing mailed this same date to:

O&E Farms Partnership
P.O. Box 430
Buckeye, Arizona 85326

NAN Consulting & Nutrition
PO Box 7178
Chandler, Arizona 85246

Imperial Western Products
PO Box 1110
Coachella, California 92236

Diamond Q Farms
13339 West Beverly
Goodyear, Arizona 85323

Western Milling
PO Box 1029
Los Angeles, California 90084

Tom Perry Farms
4038 South Turquoise Drive
Buckeye, Arizona 85326

A&M Livestock
Highway 43 and Houston Avenue
PO Box 96

| | |
|---|---|
| 1 | Hanford, California 93232 |
| 2 | Herd Health Management |
|   | PO Box 809 |
| 3 | Gilbert, Arizona 85299 |
| 4 | Walter Jenson Cattle Co., Inc. |
|   | PO Box 65 |
| 5 | Kingsburg, California 93631 |
| 6 | VSI |
|   | Veterinary Supply International, LP |
| 7 | PO Box 809 |
|   | Gilbert, Arizona 85299 |
| 8 | |
|   | Anderson Clayton Corporation |
| 9 | 25500 West Southern Avenue |
|   | Buckeye, Arizona 85426 |
| 10 | |
|   | WSA Farms, LLC |
| 11 | 3825 South 99th Avenue |
|   | Tolleson, Arizona 85353 |
| 12 | |
|   | Coe & Van Loo Consultants, Inc. |
| 13 | 4550 North 12th Street |
|   | Phoenix, Arizona 85014 |
| 14 | |
|   | Calva Products, Inc. |
| 15 | PO Box 126 |
|   | 4351 Winery Road |
| 16 | Acampo, California 95220 |
| 17 | Maricopa County Treasurer |
|   | PO Box 52133 |
| 18 | Phoenix, Arizona 85072 |
| 19 | D&R Farms Partnership |
|   | PO Box 339 |
| 20 | Buckeye, Arizona 85326 |
| 21 | Korral Kool Service |
|   | 3355 North Reseda |
| 22 | Mesa, Arizona 85215 |
| 23 | Energy Feed International, LLC |
|   | PO Box 6039 |
| 24 | Lago Vista, Texas 78645 |
| 25 | |
| 26 | /s/ Jason Antonino |